**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

JOSEPH D. SIEWERT,

Plaintiff,

vs.

BFI WASTE SYSTEMS OF NORTH AMERICA, INC., a Delaware corporation,

Defendant.

Case No. 00-1513 DDA/FLN

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

---

Cote Law Firm, Ltd., by BRIAN E. COTE, Minneapolis, Minnesota, appeared on behalf of Plaintiff.

Rider, Bennett, Egan & Arundel, LLP, by PETER GRAY, Minneapolis, Minnesota, appeared on behalf of Defendant.

---

This case involves a retaliatory discharge claim under Minnesota's Workers' Compensation Act, Minn.Stat. § 176.82 . Plaintiff Joseph Siewert ("Siewert") alleges that his former employer, Defendant BFI Waste Systems of North America, Inc. ("BFI"), terminated him because he requested workers' compensation benefits.[1] BFI has moved for summary judgment, which is appropriate if no genuine issue of material fact exists and if BFI is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). For the reasons stated herein, the Court on this record will deny BFI's motion with respect to Siewert's retaliation claim against BFI.[2]

---

[1] The Court notes that Siewert voluntarily seeks to dismiss that part of his Complaint alleging BFI's failure to offer continued employment benefits. Siewert also offers no evidence or argument in support of the allegation in his Complaint that BFI has a pattern and practice of retaliating against employees making workers' compensation claims. The Court therefore will grant BFI's motion for summary judgment with respect to those aspects of Siewert's Complaint, and the discussion in this Order will be limited to Siewert's claim that BFI terminated him in retaliation for requesting light duty work and other benefits available under Minnesota's workers' compensation statute.

[2] Siewert has moved to strike the supplemental affidavit of Craig Seim that BFI submitted with its reply memorandum. As the Court indicated at oral argument, Siewert's motion also is

FILED JUL 31 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

I.

BFI provides collection, recycling, and waste disposal services to both residential and commercial customers. Siewert began working for BFI in March 1996. Siewert started as a residential truck driver and eventually was promoted to a commercial truck driver in September 1998. On August 27, 1999, Siewert injured his shoulder in the course of his employment. Siewert applied for and received workers' compensation benefits in connection with that injury. Siewert's doctor restricted him to light duty work until September 22, 1999, and after September Siewert continued with a course of physical therapy to rehabilitate his shoulder. During Siewert's course of physical therapy, BFI management expressed some concerns to Siewert about the physical therapy appointments interfering with Siewert's work schedule. Physical therapy failed to improve the condition of Siewert's shoulder, and Siewert's doctor in December 1999 again restricted Siewert to light duty as of January 3, 2000. Mike Stone, a BFI manager, received an e-mail on January 5, 2000, which stated that Siewert was returning to light duty and would be receiving additional workers' compensation benefits. According to Siewert, both his physical therapist and his doctor also told him that he was a candidate for shoulder surgery. Siewert testified that he informed BFI's human resources coordinator in the latter part of December 1999 that this shoulder surgery was likely.

One of the stops to which Siewert was assigned was the Wild Tymes bar, which became a BFI customer in December 1999. On January 3, 2000, only a few weeks after hiring BFI, the Wild Tymes contacted Michael Tocko, a BFI sales representative, to cancel BFI's account. Persons from the Wild Tymes indicated to Tocko that they were dissatisfied with Siewert's service and that they had retained another debris collection company with rates lower than BFI's. Tocko could not persuade the Wild Tymes to remain a BFI customer, and Tocko sent an e-mail to BFI management stating that the Wild Tymes had cancelled due to Siewert's poor service. Tocko's message states particularly that Siewert was unhelpful, would not remove all the trash,

---

denied, and the Court will consider the supplemental affidavit as part of the record for BFI's motion.

and would not aid Wild Tymes employees in loading the trash to be removed. Tocko also stated that Siewert complained to the Wild Tymes employees that BFI had set up the account improperly.

Mike Stone and Jeff Constans, another BFI manager, met with Siewert on the afternoon of January 5, 2000, and terminated Siewert's employment. Stone told Siewert that the only reasons for Siewert's termination were Siewert's poor service to the Wild Tymes and Siewert's public criticism of BFI. Despite that fact, Stone also asked Siewert's immediate supervisor to document any problems Siewert had with customers other than the Wild Tymes so that such documentation could be placed in Siewert's personnel file. This information was not placed in Siewert's personnel file until several days after Siewert's termination.

BFI had a progressive discipline policy in place when Siewert was terminated. During the time Siewert worked for BFI, BFI documented that a number of other drivers on various occasions repeatedly had missed work, missed stops on their routes, shouted vulgar language at customers, and destroyed company equipment. Much of this behavior was similar to what Siewert was accused of doing at the Wild Tymes, and some of this behavior also caused BFI to lose customers. BFI did not terminate any of these other drivers, however, without first issuing written warnings and noting a pattern of misconduct, which BFI did not do in Siewert's case. These other drivers were residential drivers, and Stone testified that Siewert was treated differently because BFI held its commercial drivers, including Siewert, to a higher standard of behavior than its residential drivers. Craig Seim's affidavit states essentially the same facts. The record does not show that Siewert was aware of this higher standard by example, and BFI's written disciplinary policies do not distinguish residential from commercial drivers in any way.

II.

To establish a prima facie case of retaliation under Minn.Stat. § 176.82, Siewert must demonstrate that he engaged in protected behavior, that he suffered an adverse employment action, and that a causal link connects those two events. Kunferman v. Ford Motor Co., 112 F.3d 962, 965 (8th Cir. 1997). Claims of retaliation under Minn.Stat. § 176.82 are subject to the

McDonnell Douglas burden-shifting analysis, Benson v. Northwest Airlines, Inc., 561 N.W.2d 530, 539 (Minn.Ct.App.1997), which means that Siewert also must present evidence that any legitimate business reason BFI offers in support of its decision to terminate Siewert is pretextual. For purposes of this motion, BFI concedes that Siewert's workers' compensation claim and subsequent termination establish the first two elements of his prima facie case. BFI focuses instead on the third element, arguing that Siewert cannot establish a causal link between his workers' compensation claim and his termination. In the alternative, BFI argues that Siewert cannot show that the reason BFI advances in support of its termination decision, Siewert's poor service to a customer, is a pretext for an unlawful retaliatory motive.

A.

BFI points out that the timing of Siewert's termination in itself is not sufficient to prove causation. Kunferman, 112 F.3d at 965. That proposition is true as far as it goes, but it does not end the inquiry. The Minnesota Supreme Court recently noted that the events leading up to an employee's termination, including the timing of the termination, are relevant to the issue of causation in a retaliation case, as is the employer's treatment of other employees who engage in similar misconduct. Hoover v. Norwest Private Mortgage Banking, No. C8-99-1281, 2001 WL 811041, at *10 (Minn. July 12, 2001). See also Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 445 (Minn. 1983) (stating that causation may be inferred when "the employer has actual or imputed knowledge of the [employee's] protected activity and the adverse action follows closely in time"); Randall v. Northern Milk Prods., Inc., 519 N.W.2d 456, 460 (Minn.Ct.App. 1994) (holding that the entire "sequence of events leading to" an employee's discharge is relevant in determining causation). The Court accordingly must examine all the evidence to evaluate whether Siewert has met his burden of showing causation, and the timing of Siewert's termination can be evidence of causation if other evidence supports the conclusion that Siewert's worker's compensation claim was a motivating factor in BFI's termination decision.

Although the causal connection between Siewert's termination and his workers' compensation claim is tenuous, the Court is obliged to view the evidence in the light most

favorable to Siewert. Under that standard, Siewert has produced enough evidence to establish a prima facie case. BFI was concerned that Siewert's physical therapy for his shoulder injury interfered with his work, and the shoulder surgery Siewert claims he required presumably would have disrupted Siewert's schedule even more. Siewert was terminated the same day Stone was informed Siewert was returning to light duty and within days after Siewert claims he informed BFI of the need for surgery. The circumstances of Siewert's termination also seem to be inconsistent with BFI's written disciplinary policies and with BFI's actual practice when disciplining other drivers accused of similar misconduct. This sequence of events considered as a whole supports an inference that BFI singled Siewert out for harsher treatment than other employees and terminated him because Siewert applied for benefits available under the Minnesota workers' compensation statute.

The cases upon which BFI relies to support a contrary result are distinguishable on their facts. Kunferman, which BFI insists is analogous to this case, turned upon the plaintiff's inability to show that her employer's decisionmakers were aware of her protected activity, 112 F.3d at 965, and thus that the timing of her termination was anything other than coincidental. Stone as one of BFI's decisionmakers, however, undisputedly was familiar with Siewert's workers' compensation claim and its progress. BFI also cites a line of cases holding that an employee's statutorily protected conduct does not "insulate an employee from discipline for violating the employer's rules or disrupting the workplace." Scroggins v. University of Minnesota, 221 F.3d 1042, 1045 (8th Cir. 2000) (quoting Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir.)(en banc), cert. denied, 528 U.S. 818 (1999)). But the reasoning of those cases is not applicable where, as here, the employee credibly asserts that the discipline imposed is more severe than warranted under the circumstances. See Kiel, 169 F.3d at 1136 (noting that the plaintiff did not allege that other employees were disciplined less harshly for similar misconduct). See also Hoover, 2001 WL 811041, at *10 (noting that no other employees accused of the same misconduct as the plaintiff were terminated). Although an employer may hold its employees to its rules, an employer may not use its rules as a means of retaliating against

employees who have engaged in protected conduct. A showing that an employee was disciplined more harshly than his peers for the same offense supports an inference that the disproportionate discipline in fact is retaliation against the employee.

B.

In its argument on the issue of pretext, BFI calls into question the comparison Siewert makes between himself and other BFI drivers. BFI argues that Siewert's only evidence of pretext is BFI's dissimilar treatment of other employees and that this evidence is not sufficient to show pretext because Siewert's position was not equivalent to that of the other employees. See Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994) (holding that instances of disparate treatment are evidence of pretext only if the affected employees are "similarly situated in all relevant respects"). Again, however, BFI's argument is not persuasive because the cases BFI cites are factually distinguishable from this case. Siewert was not a supervisor who ordered a subordinate to commit misconduct, as in Harvey, 38 F.3d at 972, and who thus warranted discipline more severe than the subordinate received. Siewert also had not committed a greater number of similar offenses than other employees who were not terminated, as in Cronquist v. City of Minneapolis, 237 F.3d 920, 928 (8th Cir. 2001). The "similarly situated" analysis focuses primarily on the "comparable seriousness" of the employees' conduct, id., and Siewert's misconduct arguably was less serious than that of the other drivers who received discipline short of termination.

To avoid this problem, BFI attempts to distinguish Siewert from the other drivers based on Siewert's position in the company rather than the relative seriousness of Siewert's misconduct. BFI contends that Siewert was disciplined more severely because Siewert was a commercial driver rather than a residential driver and that BFI held its commercial drivers to a more strict disciplinary standard. BFI has not demonstrated, however, that this more strict standard actually was put into practice, at least with respect to anyone other than Siewert. Stone's deposition testimony and Seim's affidavit establish that commercial drivers for BFI typically are more experienced, have more responsibility, and receive a higher rate of pay than

residential drivers. Those facts standing alone, however, do not show that BFI held commercial drivers more accountable for their conduct than residential drivers, especially since BFI's written policies say nothing on this subject. The apparent deviation from BFI's disciplinary policies with respect to Siewert could support a finding of pretext, and BFI's argument concerning the disciplinary standards applicable to its drivers does not establish that no genuine issue of fact exists on the question of pretext.

III.

For the foregoing reasons, **IT IS HEREBY ORDERED THAT:**

1) BFI's motion for summary judgment is GRANTED in part. Siewert's claims that BFI failed to offer him continued employment and that BFI engaged in a pattern of practice of retaliation are DISMISSED with prejudice.

2) BFI's motion for summary judgment is DENIED in all other respects.

Dated: July 31, 2001

DONALD D. ALSOP, Senior Judge
United States District Court

# Please forward this announcement to the recipient of this fax.

---

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

## For additional information on either program please visit our website at www.mnd.uscourts.gov.

---

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500